UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,                    Court File No. 15-cr-70 (ADM/LIB) (1)

               Plaintiff,

v.                                                                    **REPORT AND RECOMMENDATION**

Caleb Stuart Lofald,

               Defendant.

_____

This matter comes before the undersigned United States Magistrate Judge upon Defendant Caleb Stuart Lofald's ("Defendant") Motion to Suppress Searches and Seizures, [Docket No. 20], and Motion to Suppress Statements, [Docket No. 21]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on April 28, 2015, regarding the parties' pretrial motions.[1] The parties requested the opportunity to submit supplemental briefing after receipt of the transcript from the evidentiary hearing on the motions to suppress, the motions to suppress were then taken under advisement on May 27, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 20], and Motion to Suppress Statements, [Docket No. 21], be **DENIED**.

## I.   BACKGROUND AND STATEMENT OF FACTS

### A. Background

Defendant is charged with one count of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e); five counts of receipt of child pornography, in violation of 18

---

[1]The Court addressed the parties' pretrial discovery motions by separate order, [Docket No. 25].

U.S.C. §§ 2252(a)(2) and 2252(b)(1); and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 1]).

**B. Facts**

The record presently before the Court indicates that in September of 2014, Officer Dale Hanson of the Minneapolis Police Department conducted an undercover peer-to-peer file sharing investigation of Internet Protocol ("IP") address 68.119.16.86, which was associated with a target in Duluth, Minnesota. (Govt. Ex. 1, 8; Govt. Ex. 3, 8). During the investigation, Officer Hanson used undercover investigative software to download computer files containing known images of child pornography from a host computer associated with IP address 68.119.16.86 that was running peer-to-peer file sharing software. (Govt. Ex. 1, 8; Govt. Ex. 3, 8). Pursuant to an administrative subpoena, Officer Hanson learned that IP address 68.119.16.86 was associated with telephone number 218-723-3217 and "No. 7 Fire Hall" located at 1419 Maple Grove Road, in Duluth. (Govt. Ex. 1, 8; Govt. Ex. 3, 8). On October 2, 2014, Officer Hanson informed Investigator Jeanine Pauly of the Duluth Police Department of his investigation and asked Investigator Pauly to verify that the name of the location associated with IP address 68.119.16.86 was City of Duluth Fire Hall Number 7 and to confirm whether there was open wireless internet access at that location. (Govt. Ex. 1, 8; Govt. Ex. 3, 8).

Investigator Pauly confirmed that 218-723-3217 was a municipal telephone number assigned to the City of Duluth Fire Department Station No. 7 ("Station No. 7"), which was located at 1419 Maple Grove Road. (Govt. Ex. 1, 8; Govt. Ex. 3, 8).  Investigator Pauly also learned that City of Duluth policy required firefighters to purchase their own internet service accounts for any non-city internet use and that the city-owned computer at Station No. 7 did not have a wireless internet card in it when it had been installed. (Govt. Ex. 1, 8; Govt. Ex. 3, 8).

On October 8, 2014, Officer Hanson forwarded to Investigator Pauly computer screenshots taken during his investigation, which indicated that, on September 7, 8, and 20, 2014, Officer Hanson had been able to download from the host computer associated with IP address 68.119.16.86 a total of 117 pieces of computer files containing child pornography, which included forty-five complete files. (Govt. Ex. 1, 9-10; Govt. Ex. 3, 9-10).

On October 23, 2014, Investigator Pauly learned that Station No. 7 had a password protected non-city wireless internet account available onsite identified as "Leeloodallasmultipass". (Govt. Ex. 1, 10; Govt. Ex. 3, 10).

On November 12, 2014, Officer Hanson informed Investigator Pauly that, on November 9 and 10, 2014, Officer Hanson had been able to download from the host computer associated with IP address 68.119.16.86 a total of 11 additional pieces of computer files containing child pornography, which included seven complete files. (Govt. Ex. 1, 10-12; Govt. Ex. 3, 10-12).

Investigator Pauly obtained payroll and schedule records for the employees working at Station No. 7 on September 9, 10, and 20, 2014, and November 9 and 10, 2014. (Govt. Ex. 1, 12; Govt. Ex. 3, 12). Reviewing those records, Investigator Pauly learned that only two employees, one of which was Defendant, had worked at Station No. 7 on all of the dates on which Officer Hanson had been able to download pieces of computer files containing child pornography from the host computer associated with IP address 68.119.16.86. (Govt. Ex. 1, 12; Govt. Ex. 3, 12). Investigator Pauly queried the Minnesota Department of Motor Vehicles and obtained vehicle and home residence information for Defendant and the other employee. (Govt. Ex. 1, 12; Govt. Ex. 3, 12). That information included the address of Defendant's residence, 5494 Hermantown Road, in Hermantown, Minnesota, and the license plate and vehicle identification numbers of three vehicles registered to Defendant. (Govt. Ex. 1, 12; Govt. Ex. 3, 12). Investigator Pauly also

checked the employees' criminal records and learned that Defendant had obtained a permit to carry a firearm that listed the address of his residence.  (Govt. Ex. 1, 12; Govt. Ex. 3, 12).

On November 19, 2014, Investigator Pauly drafted applications for warrants to search Station No. 7 and Defendant's residence.[2] (Govt. Ex. 1, 13; Govt. Ex. 3, 13). Investigator Pauly's affidavit in support of the applications for warrants to search Station No. 7 and Defendant's residence both contained the details of Officer Hanson's and Investigator Pauly's investigations that are listed above.  (See Govt. Ex. 1, 9-13; see also Govt. Ex. 3, 9-13).  Both affidavits also contained a statement that Investigator Pauly was aware that firefighters reside part-time at fire stations during their twenty-four hour shifts there, and that it was common for firefighters to bring small or personal items, including personal electronic devices, to and from work from their personal residences and that some items may remain at fire stations when the employees' shifts ended. (See Govt. Ex. 1, 13; see also Govt. Ex. 3, 13).

On November 19, 2014, the Honorable John DeSanto, District Judge of Sixth Judicial District of the State of Minnesota, determined that probable cause supported the issuance of the search warrants. (See Govt. Ex. 2, 3; see also Govt. Ex. 4, 3).  Those warrants each authorize a search for indicia of occupancy, digital devices and storage media, child pornography, pornographic magazines or books, video tapes and other video storage media, photographs and cameras, film, receipts for the purchase of child pornography, correspondence to and from individuals with access to child pornography, notes pertaining to a table of contents of pornographic files in a CD collection; writings which could include login names and passwords

---

[2] Investigator Pauly also applied for a warrant to search the residence of the other employee who had been at Station No. 7 on all of the dates on which Officer Hanson had been able to download pieces of computer files containing child pornography from the computer associated with IP address 68.119.16.86.  (April 28, 2015, Motion Hearing, Digital Recording, at 2:01:20 p.m.). Only the warrants authorizing the searches of Station No. 7 and Defendant's residence are at issue.

for computer accounts and digital devices; and receipts for internet service. (See Govt. Ex. 2, 1-2; see also Govt. Ex. 4, 2).

Officers of the Duluth Police Department, including Investigator Pauly and Sergeant Thomas Champaigne, executed the search warrant for Station No. 7 after 10:00 a.m. on November 20, 2014. (April 28, 2015, Motions Hearing, Digital Recording at 2:06:00-2:08:15 p.m.)[3]. All of the firefighters at work at Station No. 7 on November 20, 2014, were gathered into a single room along with Investigator Pauly and two other officers, to allow the officers to address the firefighters. (Id. at 2:09:55-2:10:40 p.m.).

Defendant approached Investigator Pauly in the hall after she addressed the assembled firefighters and asked to speak with her. (Id. at 2:12:55-2:13:20 p.m.). Defendant told Investigator Pauly that he could make the search easier for the officers if he could talk with Investigatory Pauly and that it was he who the officers wanted to speak with.  (Id. at 2:12:50-2:13:00 p.m.). Investigator Pauly got Sergeant Champaigne to accompany her and brought Defendant into a room that had already been photographed by the officers executing the search warrant. (Id. at 2:13:25 p.m.). Investigator Pauly was unaware at the time she selected the room that the room was Defendant's room at Station No. 7. (See Id. at 2:14:00 p.m.).

Once in Defendant's room at Station No. 7, Investigator Pauly and Sergeant Champaigne closed the door to the room and proceeded to interview Defendant. (Id. at 2:19:45-2:19:55 p.m.). Before the interview began, Investigator Pauly turned on a digital audio recorder and the officers told Defendant that they would not be arresting him that day. (Id. at 2:14:35-2:14:55 p.m., 2:17:00 p.m.). After getting Defendant's permission, Sergeant Champaigne sat on the bed in the room, while Investigator Pauly took a position near the room's closet. (Id. at 2:19:55-2:20:20

---

[3] There was no involvement by Federal law enforcement authorities in the pre-search investigation, application for search warrants, and execution of the search warrants. (See Generally, April 28, 2015, Motions Hearing, Digital Recording at 1:27:45-4:01:00 p m.).

p.m.). Defendant eventually sat on the bed as well. (<u>Id.</u> at 2:20:00 p.m.). Both Sergeant Champaigne and Investigator Pauly were armed with weapons that remained in the officers' holsters during the interview. (<u>Id.</u> at 2:14:10-2:14:30 p.m.). The officers did not read Defendant <u>Miranda</u> warnings. (<u>See</u> <u>Generally</u>, Govt. Ex. 18).

Defendant was not restrained during the interview. (April 28, 2015, Motions Hearing, Digital Recording at 2:14:10 p.m.). No threats were made to Defendant during the interview and at no time did the officers raise their voices to Defendant. (<u>Id.</u> at 2:15:30-2:15:48 p.m.). Defendant did not appear to the Investigator Pauly to be under the influence of intoxicants and appeared to be oriented as to time and place. (<u>Id.</u> at 2:15:49-2:15:55 p.m.). Defendant informed the officers during the interview that he had graduated from high school and had attended firefighter training. (<u>Id.</u> at 2:16:05-2:16:15 p.m.). To Sergeant Champaigne, Defendant's answers to the officer's questions appeared to be appropriately responsive. (<u>Id.</u> at 3:24:05 p.m.).

Defendant's demeanor varied during the course of the interview. (<u>Id.</u> at 2:17:45-2:18:10 p.m.). He would at times be polite and at other times become emotional, occasionally crying. (<u>Id.</u>).  At one point during the interview he asked for and was provided with a glass of water and his jacket. (<u>Id.</u> at 2:20:50-2:21:10 p.m.). Defendant did not attempt to leave the room the officers were interviewing him in. (<u>See</u> <u>Id.</u> at 2:21:55-2:22:00 p.m.).  Investigator Pauly later testified at the evidentiary hearing that the officers would not have stopped Defendant if he had attempted to leave the interview. (<u>Id.</u> at 2:20:40-2:20:45 p.m.).

Shortly after the interview began, Defendant admitted that he had been involved in sharing computer files using a laptop computer and the file sharing program Utorrent.  (<u>Id.</u> at 2:17:05-2:17:50 p.m.). The following exchange then occurred:

Defendant:     [Inaudible] that's the thing that…

Champaigne:   The recorder?

Defendant:   I don't like the recorder.

Champaigne:   Well I understand that.  And you know what, we record it because it protects you. It protects you.  Because, I can't say yeah, you told me this or you said this.  And I'm horrible.  But, I'm, I'm horrible at, if I write things down, I can't usually read it.  And, I don't want to make mistakes or say you said something that you didn't. I'm, I'm not going to put any words in your mouth.  It protects you as well as protects us.  So we, we can't say that you said something that you didn't.  And, um, you can't say that we beat you up or, you know, made you talk to us.  So, that's a, that's a complete decision of yours is if you …

Pauly:   And I just got these, so I'm going back and forth, so my note taking is horrible.

Champaigne:   Yep. So that, that's a decision you have to make on your own.  We can't help you with that one.  You can sit … go ahead if you want, just sit.  Um.  I tipped your bed over.  This isn't the end of, the end of the world for you.  This is a bump in the road.

Defendant:   You kidding me?

Champaigne:   No. I'm not.  You realize we do this every day.

Defendant:   This is gonna mean my job.  I'm losing my job, my family, kids…

Champaigne:   It, it could be a bump in the road.  It could be a decent bump in the road.

(Govt. Ex. 18 at 1:45-3:20).

During the interview, Defendant asked the officers what the minimum was that he could

be charged with. (April 28, 2015, Motion Hearing, Digital Recording at 2:18:15 p.m.).

Approximately seven minutes into the interview, the following exchange occurred:

Defendant:   [Inaudible] Why do you have to beat around the bush like that?

Champaigne:   Well.  Caleb, the fact remains the same.  We're here on the search warrant.  And, you know what? You don't have a history of anything.  You don't have a bad history. Your impact and exposure is minimal on the criminal side.  It's, it's something that we have to do, but …

…..

Defendant:   What's, what's the minimum we're looking at?

Pauly:          You're looking at charging, is that what you're looking at?

Defendant:     Yeah.

Pauly:          First of all, why don't I ask you this question? What have you been downloading? Music? Videos? Like regular videos? Or have you been downloading child pornography? … You asked me not to beat around the bush.

Defendant:     Yeah. I know it. I know.

Pauly:          And I know it's tough.

Champaigne:    Caleb, let me put it this way. If, you know, we're here because of child pornography. You know about that. Right? So tell me. Explain to me why. You know. Explain to me what, what pointed you in that direction.

(Govt. Ex. 18 at 7:00-8:55). Investigator Pauly and Sergeant Champaigne both testified at the evidentiary hearing that, at the time of the interview, they were not aware of any evidence that Defendant may have also been producing child pornography. (Id. at 3:03:00 pm; see also Id. at 3:19:25 p.m.).[4]

Approximately thirteen minutes into the interview, the following exchange ensued:

Champaigne:    Are you, are you going to have some struggles? Yeah. You are. You're going to have some struggles. Yeah.

Defendant:     I'm not going to have a job.

Champaigne:    You know, that's, that's not up to us.

Pauly:          I don't know. . . . Wait, you asked me a question earlier on what happens. The people that we talk with like you that are honest with us. A lot of them end up doing just fine.

Defendant:     Doing just fine.

---

[4]At the evidentiary hearing, Investigator Pauly testified that she presents cases concerning the possession of child pornography for prosecution in Minnesota state court. (See April 28, 2015, Motions Hearing, Digital Recording at 3:01:00-3:01:20 p.m.). Investigator Pauly also testified that she was familiar with state court sentencing in cases concerning the possession of child pornography and that a typical sentence under the Minnesota sentencing guidelines for first time possession of child pornography is a presumptive stayed sentence and probation. (Id. at 3:01:20-3:02:00 p.m.). Investigator Pauly further testified that her answers to Defendant's questions during the interview reflected her experience with presenting cases concerning possession of child pornography for prosecution in Minnesota state court. (See Id. at 3:01:00-3:02:00 p.m.).

Pauly:          They go to treatment.

. . . . .

Champaigne:  You know, and, and people do get help for this.  People do go seek help and get treatment for this.  Some people do really well.  And, and, and it was a bump in the road, and then they've moved on and then they've put it behind them.  I'm working on a guy who Jeanine's working on, on, his third time that we've dealt with him.

(Govt. Ex. 18 at 13:15-15:15).

Approximately seventeen minutes into the interview, Sergeant Champaigne told

Defendant the following:

Champaigne:  We are.  I mean.  So you can, you can … like, I've said it before.  You don't have to talk to us.  [inaudible] I've said that to you before.  The thing is, we're going to find out.  If you, if you want to cooperate and tell us this is what I did, this is why I did, this is how I did, this is . . . you know?  That's great.  And it looks good for the court.  The court says you know he's not [inaudible].  And, and we move on.  [inaudible] What we're seeing of most people is probation. K. Not jail time, probation.  K. I can't tell you what the courts will do.  I'm just telling you the generalities. Um.  Most of the time that I've seen with people are, get angry.  But that, it doesn't lead to an end.  There is some, obviously there is some soul searching and some explanation and some, probably some counseling.

(Govt. Ex. 18, 17:50-19:30).

Other officers occasionally entered the room during the interview to consult with

Investigator Pauly and would then leave. (April 28, 2015, Motions Hearing, Digital Recording at

2:21:30-2:21:35 p.m.). Approximately sixteen minutes into the interview, Investigator Pauly also

left the room. (Govt. Ex. 18 at 15:35-15:55). While Sergeant Champaigne was alone in the room

with Defendant, Defendant asked Sergeant Champaigne to turn off the digital recorder, with

which Sergeant Champaigne complied. (April 28, 2015, Motions Hearing, at 2:16:25-2:16:45

p.m.).

The testimony at the evidentiary hearing was that, after Sergeant Champaigne turned off

the recorder, Defendant admitted that he had been using Utorrent and other computer programs

to search for and download images of child pornography and had images of child pornography on his laptop and portable hard drives that Defendant had stored in his locker at Station No. 7. (Id. at 2:18:45-2:19:45 p.m.; 2:22:15-2:22:30 p.m.). Defendant told the officers that he had also used a laptop and portable hard drive that was in a mechanical room in the garage of his home to download and store child pornography. (Id. at 2:22:30-2:22:40 p.m.).

The officers told Defendant that they had a search warrant for his residence and asked Defendant if he would like to accompany them to his residence. (Id. at 2:23:30-22:23:45 p.m.). The officers communicated to Defendant that the decision of whether to accompany the officers to his residence was Defendant's to make. (Id. at 2:24:30-2:24:38 p.m.). Defendant told the officers that members of his family were at his residence and agreed to accompany the officers to his residence to be allowed to make contact with those family members and ask them to leave before the execution of the warrant. (Id. at 2:24:00-2:24:25 p.m.).

After the interview, Investigator Pauly and other officers went to Defendant's residence to execute the second search warrant. Sergeant Champaigne drove Defendant's vehicle to Defendant's residence, at Defendant's request, with Defendant riding unrestrained in the vehicle as a passenger. (Id. at 2:26:35 p.m.). Investigator Pauly later testified at the evidentiary hearing that the officers anticipated, based on their conversation with Defendant at Station No. 7, that they would find child pornography at the residence. (Id. at 2:25:25-2:25:45 p.m.). She further testified that, had the officers not already obtained a warrant to search Defendant's residence, they would have obtained a warrant to retrieve the evidence of child pornography mentioned by Defendant during the fire station interview. (Id. at 2:25:45-2:26:00 p.m.).

At the residence, Investigator Pauly and a second officer entered the residence with Defendant, where Defendant made contact with the members of his family. (Id. at 2:26:50-

2:27:15 p.m.). Sergeant Champaigne stood in the garage while Defendant spoke to his family members and asked them to leave the residence. (Id. at 3:27:00). After Defendant's family members left, Defendant stayed in the residence's laundry/kitchen area while the officers executed the warrant to search Defendant's residence. (Id. at 2:27:15-2:27:30 p.m.). Defendant was not in restraints while the officers searched his residence. (Id. at 2:27:30 pm). Because Defendant had firearms on the premises, however, the officers restricted Defendant from going into the part of the home where the firearms were kept. (Id. at 3:27:15-3:27:45 p.m.). No one threatened, raised their voice, or made promises to Defendant while the officers executed the warrant. (Id. at 2:27:35-2:27:50 p.m.). The officers did not arrest Defendant after executing the search warrant for his residence, instead leaving Defendant at his home when they departed. (Id. at 2:28:45-2:28:55 p.m.).

Defendant was later arrested and indicted with the Federal charges now against him. On April 7, 2015, Defendant filed the present motions to suppress.

## II. DEFENDANT'S MOTION TO SUPPRESS SEARCHES AND SEIZURES, [DOCKET NO. 20]

Defendant moves the Court for an order suppressing any evidence obtained as a result of the November 20, 2014, execution of the search warrant for Station No. 7 and the execution of the search warrant for at his residence. (Def.'s Motion to Suppress Searches and Seizures, [Docket No. 20]).

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets

forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005); edits in Wiley). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing court] had a 'substantial

basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B.    Analysis**

1. Warrant to Search Station No. 7

In his memorandum in support of his motion, Defendant offers no argument to support his assertion that the warrant to search Station No. 7 was invalid. Because Defendant has offered no specific factual or legal grounds for suppression of the evidence gathered as a result of the execution of the warrant to search Station No. 7, the Court could recommend summarily denying Defendant's Motion to Suppress Searches and Seizures, [Docket No. 20], as to the warrant to search Station No. 7, solely on the basis that Defendant has failed to meet his burden of production. United States v. Jones, No. 09–cr–260 (DWF/RLE), 2009 WL 4723341, at *4 (D.Minn. Dec. 2, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); United States v. Quiroz, 57 F.Supp.2d 805, 822–23 (D.Minn.1999) (Mason, M.J.), adopted by 57 F.Supp.2d 805, 811 (D.Minn. 1999) (Kyle, J.)). Nonetheless, in an abundance of caution, the Court will address the merits of the Defendant's Motion with regard to both search warrants.  See in accord, Id., (citing United States v. Edwards, 563 F.Supp.2d 977, 995 (D.Minn. 2008) (Mayeron, M.J.), adopted by 563 F.Supp.2d 977, 984 (D.Minn. 2008) (Frank, J.).

Based on the information in Investigator Pauly's affidavit in support of the application for the warrant to search Station No. 7, the Court concludes that Judge DeSanto had a substantial basis to conclude that probable cause existed to believe that evidence of a crime could be found at Station No. 7.  Investigator Pauly's affidavit refers to Officer Hanson's peer-to-peer internet investigation in which Officer Hanson, on several occasions, was able to download files

containing images of child pornography from a computer associated with IP address 68.119.16.86, which Investigator Pauly was able to confirm was associated at the time with Station No. 7.

In this circuit, when determining whether probable cause exists to search a computer at a specific location, an IP address associated with a specific location at the time illegal internet activity associated with that IP address occurs has been found to be a sufficient basis to find a nexus between that unlawful use of the internet and the computer possessed assigned that IP address. See, e.g., United States v. Stults, 575 F.3d 834, 844 (8th Cir. 2009) (affirming finding of probable cause where affidavit in support of search warrant application referred to IP address that had been used to access child pornography sites was traced to a defendant); see also e.g., United States v. Freeman, No. 10-cr-68 (JRT/RLE), 2010 WL 4386897, at *11 (D.Minn. May 13, 2010) (finding nexus between child pornography and a computer at a physical address based on an email account, an IP address, and the home address to which the IP address was assigned), adopted by 2010 WL 4386874 (D.Minn. Oct. 28, 2010).

Under Eighth Circuit case law, the reference to Officer Hanson's peer-to-peer downloading of files containing images of child pornography from the host computer associated with IP address 68.119.16.86 at the time that the IP address was associated with Station No. 7, was a substantial basis on which Judge DeSanto could find that probable cause existed to search Station No. 7 for images of child pornography.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Searches and Seizures, [Docket No. 20], to the extent the motion pertains to the warrant to search Station No. 7.

2. Warrant to Search Defendant's Residence

Defendant asks the Court to suppress evidence gathered as a result of the execution of the warrant to search his residence. The Government concedes that the information contained within the four corners of Investigator Pauly's affidavit in support of the original application for a warrant to search Defendant's residence was insufficient to establish probable cause to search the residence. (See Govt.'s Response, [Docket No. 22], 10; Govt.'s Memorandum in Opposition, [Docket No. 29], 13). The Government contends, however, that the Court should not suppress the evidence seized from the search of Defendant's residence, arguing that the evidence could still be admitted under the good faith exception set forth in United States v. Leon, 465 U.S. 897 (1984), and, in the alternative, that the evidence obtained from Defendant's residence would nevertheless have inevitably been discovered. (Id.).

a. *Leon* good-faith exception.

"Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." Grant, 490 F.3d at 632 (citing Leon, 468 U.S. at 922). There are four circumstances in which the Leon good faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid."

United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001) (quoting United States v. Taylor, 119 F.3d 625, 629 (8th Cir. 1997)).  Defendant argues the third situation applies to the circumstances of the present case.

The Government argues that the statements in Investigator's Pauly's affidavit were not so lacking in indicia of probable cause as to make the executing officers' belief in the existence of probable cause unreasonable. The Court disagrees. The portions of Investigator Pauly's affidavit in support of each warrant application that addressed probable cause were identical. While the information in those affidavits was sufficient to create a nexus between the downloading of child pornography and Station No. 7, the physical location associated with IP address 68.119.16.86 assigned to the host computer at Station No. 7, see Freeman, No. 10-cr-68 (JRT/RLE), 2010 WL 4386897, at *11, there was nothing in the original affidavit to link the use of that computer with Defendant's residence.  The only references to Defendant's residence were basic information that it was Defendant's home and Investigator Pauly had not in her affidavit identified Defendant as the only suspect.

The Government next argues that the information the officers gathered from Defendant while interviewing him during the execution of the warrant to search Station No. 7 provided them with an objectively reasonable belief that probable cause existed to search Defendant's residence.  Defendant urges the Court to follow the precedent of the Sixth Circuit case of United States v. Laughton, 409 F.3d 745, 752 (6th Cir. 2005), with regard to the information the officers obtained, in which the Sixth Circuit held that a court may not consider information known to the officer but not in the affidavit when making a determination of whether an officer reasonably relied on the issuing judge's determination of probable cause in a search warrant,. (See Def.'s Memorandum in Support of Motions to Suppress, [Docket No. 28]).  This Court, however, is not

free to ignore the precedent of the Eighth Circuit, which expressly requires the Court to consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit", when making that determination, <u>Grant</u>, 490 F.3d at 632 (citing <u>United States v. Chambers</u>, 987 F.2d 1331, 1335 (8th Cir. 1993). In determining whether an officer relied in good faith on an issuing judge's probable cause determination, "we confine our inquiry 'to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization,' <u>Leon</u>, 468 U.S. at 922 n. 23, 104 S.Ct. 3405." <u>Grant</u>, 490 F.3d at 632 (alteration in <u>Grant</u>).

However, the purposes of the <u>Leon</u> good faith exception weigh against the Court considering knowledge the executing officers gained <u>after</u> the issuance of the pertinent warrant. "The Exclusionary Rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." <u>Leon</u>, 468 U.S. at 916. "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." <u>United States v. Farlee</u>, 910 F. Supp. 2d 1174, 1186 (D.S.D. 2012) <u>aff'd,</u> 757 F.3d 810 (8th Cir. 2014) (quoting <u>United States v. Hessman</u>, 369 F.3d 1016, 1021 (8th Cir. 2004), in turn citing <u>Leon</u>, 468 U.S. at 918). In the present case, the Court concludes that the lack of any information in Investigator Pauly's original affidavit in support of the warrant to search Defendant's residence made it so lacking in indicia of probable cause that any belief that evidence of a crime could be found at Defendant's residence on the basis of the original state court warrant for Defendant's residence was not in good faith.  Evidence gathered <u>after</u> the issuance of the warrant might provide probable cause for the issuance of a new warrant, but the Government has provided no case authority, and the Court's independent research reveals none, that holds that such after discovered evidence can

authorize entry on a warrant an officer cannot in good faith believe was valid.  Thus, even though the Court is authorized to consider evidence previously known to the officers but not put in the affidavit in support of the search warrant application, the after-acquired evidence in this case cannot have altered the executing officers' belief about the validity of the search warrant itself at the time of its execution.

   b.   Inevitable Discovery

   The Government next argues that, even if the Leon good faith exception does not apply to the circumstances of the present case, the evidence gathered as a result of the execution of the warrant to search Defendant's residence should not be suppressed because the officers would have inevitably discovered it after interviewing Defendant at Station No. 7.

   Evidence gathered as a result of an unlawful search "need not be suppressed if the two prongs of the inevitable discovery doctrine are proved by a preponderance of the evidence: (1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010) (citing Nix v. Williams, 467 U.S. 431, 444 & 448 (1984); United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008); United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008)).

   Defendant contends that the inevitable discovery doctrine does not apply here because the officers had not been actively pursuing a substantial alternative line at the time of the constitutional violation.  The Court disagrees.  At the time of the violation, i.e., the execution of the invalid warrant to search Defendant's residence, the officers had previously interviewed Defendant, who revealed the existence of contraband at his residence during the interview. At the

evidentiary hearing, Investigator Pauly testified that, had the officers not already obtained a warrant for the search of Defendant's residence, the information they obtained from Defendant during the interview about the presence of a second computer and hard drive in Defendant's residence that Defendant had used to download child pornography would have prompted them to do so.

Accordingly, the Court concludes that the Government has proved by a preponderance of the evidence both that there is a reasonable probability that the evidence seized during the execution of the warrant to search Defendant residence would have been found absent police misconduct and that the police had been pursuing a substantial alternative line of investigation at the time.

Because the police would have inevitably discovered the contraband in Defendant's residence, the Court recommends **DENYING** Defendant's Motion to Suppress Searches and Seizures, [Docket No. 20], to the extent the motion pertains to the warrant to search Defendant's residence.

## III.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS [DOCKET NO. 21].

Defendant also moves the Court for an order suppressing all statements he made on November 20, 2014, while being interviewed at Station No. 7 and while the officers executed the warrant to search his residence. (See Def.'s Motion to Suppress Statements, [Docket No. 21]).

In support of his motion to suppress both groups of statements, Defendant contends that his freedom of movement was restricted to the point that he was "symbolically" in custody during the interview and the execution of the search warrant of his residence on November 20, 2014, such that the investigating officers were required to provide him with a Miranda warning before interrogating him.

19

**A.  Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).  "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 300–01(1980)).

A defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B.  Analysis**

1.  Interview Statements

Defendant first asks the Court to suppress the statements he made while being interviewed at Station No. 7. Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th

Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)). It is undisputed that the officers' express questioning of Defendant constituted interrogation. Accordingly, the sole issue before the Court is whether Defendant was in custody for the purposes of Miranda during the interview. See United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) ("The undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether the Miranda rule applies, we must examine whether [the] interrogation was custodial.").

The Eighth Circuit has explained:

[W]e outlined six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Id., at 500-01 (internal citations omitted). "These factors, however, are not exclusive, and custody cannot be resolved merely be counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (internal citation and quotations marks omitted). "The analysis depends upon a review of the totality of the circumstances, and [t]he ultimate test is whether a reasonable

person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d at 630–31 (8th Cir. 2012) (internal citation and quotation marks omitted, alteration in Sanchez).

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Id. at 631. In the present case, this factor does weigh in favor of finding, if not strongly, that Defendant was not in custody as the officers initially told Defendant that he was not going to be arrested but did not inform Defendant until the sixteenth minute of a twenty-minute interview that he did not have to talk to them. See, United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005)). Accordingly, although the officers informing Defendant at the outset of the interview that he was not under arrest does mitigate in favor of finding that Defendant was not in custody, it does so only moderately. Ollie, 442 F.3d at 1138.

The record presently before the Court is silent regarding whether Defendant attempted to move about during the interview and whether the officers attempted to restrict any such movement. Accordingly, this second mitigating factor does not weigh for or against a finding that Defendant was not in custody. See, Id. ("The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that

it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning.").[5]

The third factor, which addresses whether Defendant initiated contact with the police or voluntarily acquiesced to the questioning by the police, mitigates strongly in favor of finding that Defendant was not in custody as Defendant initiated the interview with the officers. See Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning). Here it was Defendant himself who asked to speak to investigators because he could help them find what they were searching for at Station No. 7.

Defendant contends that the fourth factor, which addresses whether law enforcement used strong arm tactics against a suspect, aggravates in favor of finding that he was in custody during the interview, arguing that the officers impliedly promised that he would receive lenient treatment if he answered their questions.

> Although a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se. [United States v. Larry, 126 F.3d 1077, 1079, (8th Cir. 1997); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir.1995) (indicating that even if the suspect had been promised some form of leniency, this circumstance alone would not render his confession involuntary). The statement to an accused that telling the truth "would be better for him" does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary. Bolder v. Armontrout, 921 F.2d 1359, 1366 (8th Cir.1990) (involving penalty of death); see, e.g., [United States v. Pierce, 152 F.3d 808, 813 (8th Cir. 1998)] (statement that it would be to the suspect's benefit if he cooperated with them is not improperly coercive); Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir.1993) (comments that it would be in the accused's best interest to cooperate did not render his statement involuntary in death penalty case).

---

[5] Although, at the evidentiary hearing, Investigator Pauly testified that if Defendant had attempted to leave the interview on November 20, 2014, he would not have been stopped. (April 28, 2015, Motions Hearing, Digital Recording at 2:20:40-2:20:45 p.m.). This testimony is consistent with the fact that even after having seized evidence of child pornography Defendant was never physically restrained, and was not arrested despite two additional contacts with law enforcement that day after the search of Station No. 7 was completed.

Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001).

In the present case, the officers attempted to minimize the possible negative effects of the crimes of possession and distribution of child pornography, stating that it would be a "bump in the road" and indicating that first-time offenders with no criminal history typically received probation. At the point in the investigation at which the officers interviewed Defendant at Station No. 7, the investigation had been conducted solely by state law enforcement officers with no involvement of Federal law enforcement officers. Investigator Pauly later testified at the evidentiary hearing that the officers had not been aware at the time that they interviewed Defendant that he may also have been engaged in the production of child pornography. Investigator Pauly further testified that her statements to Defendant during the interview regarding his potential criminal exposure were based on and reflected the typical sentences she had seen under the Minnesota state sentencing guidelines for first time possessors of child pornography with no criminal history, like Defendant, which had been probation. Accordingly, as far as the officers were at that time aware, they were making true statements about the possible range of sentences to which Defendant was exposed based on what they then knew about Defendant's activities.

"[A] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will[.]" Simmons, 235 F.3d at 1133 (8th Cir. 2001) (quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978) ("Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made.")).

In the present case, the officers were making statements about Defendant's criminal exposure that they believed to be true under the knowledge that they had about the extent of Defendant's criminal activities as they knew them. In such circumstances, the officers' statements amounted to little more than what they believed to be a truthful statement of the possible penalties faced by Defendant. In addition, there is reason to believe that Defendant's will was <u>not</u> overborne by the statements made by Investigator Pauly and Sergeant Champaigne that his exposure might be minimal. Defendant expressed doubts as to the officers' assessment of his criminal exposure, and therefore, Defendant's statements indicate that he was nonetheless capable of making an independent assessment of the officer's statements about his criminal exposure. As such, his will was not overborne.  The fourth factor does not aggravate in favor of Defendant being in custody during the interview.

The fifth factor, which addresses whether the questioning took place in a "police dominated atmosphere," does not aggravate in favor of finding that Defendant was in custody. Defendant was interviewed in his room at his place of work rather than at a police station. <u>See</u> <u>United States v. Wallace</u>, 323 F.3d 1109, 1113 (8th Cir. 2003) (noting that interview occurring in a workplace was taking place in a familiar location where the interviewee would feel more comfortable and less threatened). In addition, although additional officers entered and left Defendant's room, there were only two officers consistently in the room with Defendant for most of the interview.  The Eighth Circuit has found that the presence of an even greater number of officers in the <u>home</u> of an interviewed suspect did not render an interview custodial.  <u>See</u> <u>Axsom</u>, 289 F.3d at 501 (concluding that mere presence of nine officers in the suspect's home was not sufficient to find that the atmosphere was police dominated).

The sixth factor, which addresses whether Defendant was arrested at the end of the interview, also does not aggravate in favor of finding that Defendant was in custody. Defendant was in fact <u>not</u> arrested upon the conclusion of his interview with the officers nor was her ever arrested that day even after the searches executed had resulted in the seizure of suspected contraband. Likewise, at no time during the interview nor the searches of Station No. 7 and his residence was Defendant ever even handcuffed or physically restrained by police.

Upon considering the totality of the circumstances, the Court concludes that a reasonable person in Defendant's position would have felt free to terminate the interview and, as such, Defendant was <u>not</u> in custody. Because Defendant was not in custody for the purposes of <u>Miranda</u>, Defendant is not entitled to have the statements he made during the interview suppressed.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 21], to the extent the motion pertains to the statements Defendant made while being interviewed at Station No. 7 by Investigator Pauly and Sergeant Champaigne.

2.  <u>Statements during the Execution of the Search Warrant for Defendant's Residence.</u>

Lastly, the Court considers the statements Defendant made while the officers were executing the warrant to search his residence. The factors here mitigate even more strongly against a finding that Defendant was in custody. Defendant was informed while at Station No. 7, that he would not be arrested that day. Defendant was not physically restrained while the officers executed the warrant to search his residence, even though the officers restricted him from areas in which he kept firearms. The officers told Defendant that it was his choice whether to accompany them to his residence for the execution of the search warrant and Defendant

voluntarily chose to accompany them. As such, Defendant voluntarily acquiesced to being at his home during the execution of the search warrant.  In addition, there is no evidence whatsoever that the police engaged in <u>any</u> strong arm or coercive tactics during the execution of the search warrant. Further, Defendant was in his own home, a place at least as, if not more, familiar and non-threatening to him as his room at Station No. 7. Finally, the officers did not arrest Defendant after the execution of the search warrant.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 21], to the extent the motion pertains to statements Defendant made while the officers were executing the warrant to search Defendant's residence.

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Defendant's Motion to Suppress Searches and Seizures, [Docket No. 20], be **DENIED**; and,

2.  Defendant Motion to Suppress Statements, [Docket No. 21], be **DENIED**.

Dated: June 3, 2015                                        s/Leo I. Brisbois
                                                          Leo I. Brisbois
                                                          U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within

14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.